Case No. 15-10.4 at all, Flamingo Las Vegas Operating v. NLRB Distribution and National Labor Relations Board. Ms. Sear, for the Distribution, Ms. Long, for the Defendant. Well, in other words, you're not even going to argue about the interrogation? Well, I was going to get there, Your Honor. I mean, I think that that's part of the entire sort of web that's been woven here, which is to say, in all these different ways, the Board has twisted the conduct that occurred to achieve a desired result, when in fact, if all of that is stripped away, the interrogation, for example, you have an instance of a supervisor asking one question to one employee in an isolated conversation. The employee declines to answer. The supervisor accepts that and walks away. There's legal authority out there that that's not interrogation. A question in and of itself is not interrogation, absent coercion or intimidation, and that conversation was completely devoid of that type of coercion. The question of do you support the union or what do you think of the union, that's not the typical question, right? That may be true, but that in and of itself doesn't make it unlawful. I mean, I think there has to be evidence of that it coerced or intimidated the employee. I think there are hundreds of cases in which the Board has held asking an employee, when a supervisor asking an employee do you support the union or not, that is inherently violation of 8A1 per se. I would disagree, Your Honor. There are cases that hold the contrary, that that type of question is not per se interrogation, that it's the context in which the question occurs that determines whether or not it's interrogation. Don't we defer to the Board on that? Well, I think you defer to the Board when the Board's findings are reasonable and based on substantial evidence, and I just don't think that's the case here. Reasonableness goes to whether or not these employees in this situation, in this environment, would have viewed the conduct, would have reasonably viewed the conduct to be unlawful, you know, creating an unlawful impression of surveillance or being unlawful interrogation. And because the Board's decision and the Board's findings strips out all of this relevant context to when and how this is happening, I think the Board's findings are not reasonable and there's not a reasonable basis to defer to the Board. What's your best 8C argument? My best 8C argument? Well, I think that the best 8C argument is that speech that interferes with... Well, it goes specifically to what speech you think was protected by 8C and is not evidence of violation of the employee's Section 7 rights. So, for example, the authorization card flyer that's distributed on October 7th. There the Board finds that that flyer is creating an unlawful impression of surveillance because it didn't identify how it came about getting this authorization card. The flyer says what? Remind us. The flyer has a copy of an authorization card and it says something along the lines of don't sign away your rights, know what you're signing. And the Board holds, well, because they didn't identify how they came about getting this card, that it created an unlawful impression of surveillance. And then there's also the bizarro. Correct. And I would think that both of those go to the same point. Explain the bizarro. Right. The flyer uses the word bizarre. I think both of those go to the same point, which is none of this was a secret in this workplace. In other words, the Board's theory is by using bizarre, it was an obvious reference to bizarro who was the chief union organizer. And, therefore, that gave to the employees the notion that there was surveillance. Correct. Your response to that is everybody knew bizarre. Everybody knew. And, in fact, one of the violations that the ALJ found, the Board reversed for that very reason. That referencing Mr. Bizarro was not creating an unlawful impression of surveillance because everybody knew that he was the lead union supporter. He was using the company's photocopier to make flyers. He was speaking to the company about this. There was e-mails flying around with company supervisors copied on them, recipients of these e-mails. But that flyer came later, right? The bizarre flyer came, I think, like two weeks later. So, I mean, the situation could have been different with the October 7th flyer as far as who knew what. Certainly, it could have been different, but I would take the position that it wasn't, that there was no covert organizing ever in this workplace, that everything was known and open from the jump. And, again, you can download these authorization cards from the Internet. The idea that you put one up on a bulletin board and somehow employees are going to think you're spying on them, I just think is a— Say you're right on that, what happens? Say you're right on that but not on some of the others. Well, I think that it is important to first start with the ones that are sort of, what I would say, are the most extreme conclusions that are clearly not based on substantial evidence. So the card and the Bizarro are your two— I would say both of the flyers. I would say the assertion that Mr. Golubowski interrogated Mr. Evans. I think there are a number of them that I don't think come close to meeting the standard of substantial evidence. And my point there would be the board's findings in these types of cases often have this downhill momentum. There's violations found, and as they consider the context of the next piece of employer conduct, they— But to be fair, they did distinguish a few that the ALJ had found, right? I mean, yeah, they did distinguish the wrong word, sorry. Reverse, yeah. They did not adopt those findings. But I think here for this court, what I would say is you have to, if you strip out those ones that I think are truly falling short, obviously falling short, then it halts that sort of downhill momentum, and it creates an entirely different context to which the ones that maybe are closer to the line need to be considered. And so the board itself— The problem—sorry to interrupt, but the problem on the closer to the line ones is a lot of them are based on credibility of what was said in certain conversations, and that puts us in a tough, tough position. I certainly understand the skepticism when credibility defenses are raised in these proceedings, but I do think, and I understand that credibility determinations are only going to be reversed when they are hopelessly unreliable, but I think that is the case here. I mean, one of the reasons you overturn credibility decisions is because they are self-contradicting, and there is no better example than this case where the judge says— the administrative law judge says, I find Mr. Bozzaro to be a witness who will embellish, exaggerate. He accuses him of making up an event. He says, I don't even know if this event occurred that Mr. Bozzaro testifies about. And so this is a man that he says will— he has already determined will create details and facts to put himself in the best light possible, and then on the very next hand says, I credit his testimony because he provided more details over the two company witnesses. With respect to which issue? That's with respect to the incident in which it's claimed that the supervisor, Mr. Myatt, threatened Mr. Bozzaro when he pulled him aside after a pre-shift meeting. And I just think Mr. Bozzaro is clearly identified as someone who is a non-credible witness, and he is nonetheless credited over company witnesses when the judge provides no demeanor analysis, no basis for why he's not crediting them. I think this is one of the rare cases— I'm forgetting his name. Golubowski. Golubowski, not credible in certain circumstances, but credible in other circumstances. I mean, that's what judges do, right? Absolutely. Absolutely. But I think when there is a debate, you know, when there's disputed evidence, and I think that's all the more reason to hold those credibility standards up to a very close, you know, under a very specific sort of microscope, under a close lens, and say, you know, is this good enough to overcome this dispute that exists in the factual recitation? I don't think Mr. Bozzaro's testimony gets there, and I think the ALJ has to sort of contradict himself and bend himself, you know, twist himself up into knots to get there. And I do think it's important to note that not only does he credit a witness that he has already said is prone to exaggeration and perhaps even lying, he does it against testimony that he doesn't go far enough in explaining why he's not crediting. No demeanor analysis. You know, no description of why, you know, there's no company witness Mr. Johnson. He just says, I believe Mr. Bozzaro over Mr. Johnson. Doesn't explain why. And I just don't think you can do that in this circumstance. I'm sorry I've run into my rebuttal time. We'll give you two minutes back for rebuttal. Thank you. May it please the court. Good morning. My name is Valerie Collins, and I represent the National Labor Relations Board. I would agree with co-counsel that this case is not ordinary, but for very different reasons. If anything, it kind of read when I first got it like a law school exam of how many issues can you possibly spot and how many ways can you possibly violate the National Labor Relations Act. Ultimately, before the court, is obviously the kind of umbrella issue of whether substantial evidence supports all of those findings that the company violated the act on numerous occasions in a somewhat wide variety of ways. What the court hinted at earlier. I must say, counsel, the two things that bothered me was the flyers. The one that emphasized bizarre and the copy of the authorization card. The notion that either one of those reflected surveillance, as that term has been used by the board, struck me as a big stretch, even if everything else is right. Well, what the board did not hold that that meant there was surveillance. The holding here is that it left the impression of surveillance. And I think context is really key here. The first flyer with the blank authorization card was essentially the next day, right around the same time that the company learned that there was kind of union activity going on amongst its employees. And what's important is essentially what the company did not say. By handing out this flyer, and I can't remember if it was posted or not, the later one was, by disseminating this flyer that has this blank authorization card and kind of like an X through it saying, you know, don't don't sign it with the company is conveying is that we know this is going on. But what the company did not do was convey the fact of they got that completely legitimately. And there lies the violation, because it's reasonable for employees to kind of come to the conclusion that they don't know, to fear. How did they get that card? How would they get it illegitimately? Well, for example, well, I mean, here it would be by monitoring their activities. Somebody gave it to them, right? Yes, but they didn't know that. The employees didn't know that. I don't understand how else. I mean, it's sort of obvious, isn't it, that somebody would have given them the card? No, I mean, it wasn't obvious because they didn't say it. Where else would it come from? From a satellite? Well, I mean, this is this is a casino. Maybe they saw somebody having a card. I mean, I don't know. And that's where the problem is. It's because they were left to wonder where they got that card. What if a supervisor, this Mr. Kolobyowski, had said to one of the security guards, I hear that this guy's passing out cards. Give me your card. I want it. And that's how they got it. Well, I mean, I think that that might bring up some other issues. What I guess I'm saying is that if that's one way that they could have gotten the card improperly, right? Yes, it is. It is. But, I mean, the key here is that they were left to wonder and they were left to fear. And there lies the violation. And when I kind of explain. Suppose the employer were to give a speech to the employee and say, I understand that the primary union argument refers to the wage rate that I'm paying compared to other casinos. And that argument is false. Indeed, I'm paying more than other casinos. Would the board conclude, uh-oh, he, in making that statement, is making reference to what the union says, therefore giving the impression that somehow he's surveilling the union? If there's no explanation given and it's reasonable for employees to wonder that, then yes. When you don't tell how you got the information, that's the problem. You're just left wondering and feeling paranoid. No, I should have to tell that one of the employees who's anti-union has told me that. And if I disclose who it is, he may get punched in the nose. You know, that doesn't make a lot of sense to me. This impression of surveillance. I mean, surveillance can be a problem. And when Kobayaski, is that his name? Well, yeah. Kobayaski asks somebody, are you a member of the union or do you sympathetically union? That's classic stuff. The board seems to be on sound ground. But putting out a copy of an authorization card, giving the impression there's surveillance, is a big stretch. I would have to respectfully disagree. When I kind of explain the impression- In the hypothetical I just gave you, the board has for 50 years never regarded that as an impression of surveillance. I am, as an employer, I understand the union is arguing X. And that is wrong. The board has never said that that is illegal. I don't know. I don't know. If you say so. I don't know that the board has never held that. I don't know the kind of the depth of the case law. But there are plenty of situations where it's very similar. And we cite cases very similar to this situation here in our brief. I would liken it to, and this is somewhat of a gender hypothetical. But if someone came up to me and said, oh, Miss Collins, I really loved your outfit that you were wearing this weekend. And then walked away and didn't say anything else. It would be reasonable for me, kind of not in legal terms, but to think that was a little creepy.  If he went on to say, I liked what you were wearing this weekend because, you know, your mom showed me your picture. There, it would be unreasonable for me to think that I have a stalker. I mean, and you can kind of transfer that easily to the situation here. When you say to employees, we know what you're doing. And you leave it at that. It's not unreasonable for employees to be a little afraid and to be into fear that management is kind of peeking over their shoulder. Reproducing email conversation, sure. But it just seems the authorization card and use of the term bizarre seems a bit of a reach. But you've made a good argument. Well, and I think that with the bizarre flyer, opposing counsel kind of mentioned the fact that the word bizarre was used. It wasn't just that the word bizarre was used. It was highlighted. I mean, not with a highlighter, but it was in all capital letters. Certainly, it indicated the company knew that Bizarro was the chief organizer. But that was hardly a secret. Well, I mean, and I also want to distinguish what the company said earlier that the board, and the board did here, disagree with the ALJ determination that there was a later impression of surveillance because by that point, everybody did know. What's key with that kind of distinction, that was in January. We're talking about activities in October. And October is the very first month that there was any union activity going on that the company knew about. So later on, yes, it makes sense to say everybody knew by that point. With the point of when the company was disseminating these flyers, there's no evidence that everybody knew. There's evidence that employees knew. There's also evidence that the company knew, but there's no evidence that employees knew the company knew. So that's where they're left wondering, oh, I didn't know they knew that. How did they know that? How did they figure this out? And there lies the violation. One of the things I did want to highlight here, because the company makes, you know, kind of woven throughout their brief and their argument is this 8C claim that the board here kind of trampled upon their free speech rights and their right to say their opinions about unionization. And here, this case is kind of interesting because the facts of this case on itself show that that contention is just incorrect. The company here mounted a very vigorous anti-union campaign. There's tons of evidence in the record that most of what they did was completely legitimate. And I think it's highlighted with the Bizarro flyer, the Bizarre flyer, which is on 209 of the appendix. That flyer is sandwiched in between two other flyers that are completely legitimate. They have the same message. So, in essence, the company was free and, in fact, did lawfully, legitimately state its opinions on unionization. But there are findings here that are amply supported by their evidence that there were specific instances that it kind of stepped over that line. You see how broad the argument you're making? You're really making an argument that any time an employer gets up and says, I understand the union is arguing X, and that's not right, or this is my – you're saying in those circumstances there's a violation of 8A1 because the employer is giving the impression that he's surveilling the employees because he knows what argument the union is making, and he doesn't tell them how he knows. That is not what I'm arguing, and I think – Well, I don't see any distinction between that and – Well, I think the flyers itself in the record show that that's not what the board held here. They can absolutely say these are the union's contentions and these are why – these are the reasons why we think the union's wrong. But if the employer says these are the union contentions, the question is, well, how does he know? And the board considers the totality of the circumstances, and in the totality, if there's kind of a hint or a suggestion that the employees are left to wonder and kind of be paranoid and fear where the information came from, that's where it crosses the line. And sometimes the line is, you know, it's debatable, and it's close. And there are other times where – So in your view, we should protect paranoid employees? I wouldn't call them paranoid. You said paranoid. Reasonably fearful that management is peering over their shoulders. I see that my time is up, but for the foregoing reasons, we ask that the board's order be enforced in its entirety. Thank you. Thank you. Two minutes for rebuttal. Thank you. So just to sort of put a bow on the questions related to the flyer, I think there's a couple important points. First of all, this notion that perhaps the organizing activity was sort of unknown or secret in the beginning and later became revealed. I don't think the record supports that. Mr. Bizarro was allowed to engage in this organizing activity on working time. He was doing it in the property on working time, openly in front of his— At what point? Did the evidence show at what point was that apparent? From the beginning, I believe. Well, what does beginning mean? September was when it began. In other words, a month before the Bizarro flyer went out. That's correct. The organizing activity began in September, and I believe— But what's the evidence in the record that the company— he was aware that the company was aware of what he was doing? Well, I don't know that the standard is does Mr. Bizarro need to be aware that the company is aware, but I think the employees would not have viewed it as a secret that would have not been available to the company but for some sort of unlawful surveillance, particularly with the authorization card flyer. What is evidence on the Bizarro? What evidence is there that it was well known that he was the organizer? I believe that Mr. Bizarro testified that he was walking around during his regular rounds as a security officer, meeting up with other employees, handing out cards, speaking to them openly. This was not discreet. It was not covert. This is entirely different from a case where all the organizing is happening off-site, out of the view. I mean, it is a casino. Nothing goes unseen in a casino, not to say that they're surveillance, but the point is their supervisors were all around them, and it's a very open environment. You don't do anything in a casino that you don't expect is going to be observed, and so they were not trying to hide this. There was never any indication that they were trying to hide this, which, again, I think goes to the point that the unlawful impression of surveillance isn't reasonable. I would also say that context, you know, opposing counsel noted that context is critical, and that would be our argument as to why so many of these ones fall short, because this really was an open environment such that you couldn't reasonably view that there were violations of the act. Thank you very much. The case is submitted. Stan Lee. Thank you.
judges: Kavanaugh, Wilkins, Silberman